Filed 7/18/25 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| A.B., a Minor, etc., | D084376 |
| Plaintiff and Appellant, | (Super. Ct. No. 37-2020-00039800-CU-PO-NC) |
| v. | |
| COUNTY OF SAN DIEGO et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 26, 2025, be modified as follows:

On page 8, footnote 3 is deleted. All subsequent footnotes are renumbered accordingly.

On page 37, a new footnote is added immediately after the sentence ending with "we must reverse the judgment as to him as well." The text of the new footnote is as follows:

> In a petition for rehearing, defendants argue that Sheriff Gore owed no duty to the public to exercise due care in training deputies. We do not decide this duty issue because it was raised for the first time in the defendants' reply brief below; it was not the basis for the trial court's ruling; and it was not properly briefed or meaningfully developed under a

separate argument heading as an alternative ground for affirmance in the respondents' brief on appeal.  (See *Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 703–708 [trial court erred by granting summary judgment on duty issue not asserted in moving papers]; *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 70 [due process prevents court from granting summary judgment on ground of law not asserted in moving papers without first giving opposing party an opportunity to respond and a chance to show triable issue of material fact as to that ground]; *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we do not consider all of the loose and disparate arguments that are not clearly set out in a heading and supported by reasoned legal argument" as required by rule 8.204(a)(1)(B) of the California Rules of Court].)

There is no change in the judgment.

The petition for rehearing is denied.

IRION, Acting P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| A.B., a Minor, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF SAN DIEGO et al., <br><br> Defendants and Respondents. | D084376 <br><br><br><br> (Super. Ct. No. 37-2020-00039800-CU-PO-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Reversed and remanded.

Law Offices of Dale K. Galipo, Dale K. Galipo, Hang D. Le; Law Office of John Fattahi and John Fattahi for Plaintiff and Appellant.

Office of County Counsel, Ronald C. Lenert and Morris G. Hill, Deputy County Counsel, for Defendants and Respondents.

A Hobby Lobby manager called law enforcement because Kristopher Birtcher appeared to be suffering from a mental health crisis at the store.  Other than being under the influence of drugs, Birtcher had committed no crime and made no threats against anyone.  He was unarmed.  After sheriff's deputies arrived and decided to detain Birtcher for assessment, he tried to flee into the parking lot.  Birtcher was eventually brought to the ground and

subdued by multiple deputies who double-cuffed his hands behind his back, secured his ankles together, tied his ankles to a cord around his waist, and applied bodyweight pressure to his back while he was lying face down on the pavement. While restrained in this prone position, Birtcher gasped, "Can't breathe," and called out for help. When Birtcher finally stopped moving after several minutes, the deputies kept him in a prone position for another 50 seconds before turning him on his side, then later returned him to a prone position and resumed pressing down on his back. Within 25 minutes of the first deputy's arrival at the scene, Birtcher was no longer breathing. By the time paramedics arrived and placed him on a gurney, he was dead from asphyxiation and sudden cardiac arrest.

After unsuccessfully litigating federal claims in federal court, Birtcher's minor daughter A.B. brought state claims in state court against defendants County of San Diego (County), Sheriff William D. Gore, and eight individual sheriff's deputies. She asserted claims for wrongful death, battery, negligence, and negligent training, and a survival action for violation of Civil Code section 52.1 (Bane Act).

On summary judgment, the trial court found no triable issues of material fact on plaintiff's theory that holding Birtcher in restraints in a prone position and applying bodyweight pressure to his back in the last minutes of his life constituted excessive force. The court concluded that Birtcher's restraint was "by the book" and "as it should be." The court further ruled that plaintiff had failed to identify a legal basis for her negligent training theory asserted against Sheriff Gore.

We reverse. Construing the facts in the light most favorable to the plaintiff, we conclude there are triable issues of material fact on her claim of excessive force used to restrain Birtcher. Moreover, the trial court erred in

2

granting summary judgment on plaintiff's direct negligence claim against Sheriff Gore because plaintiff identified a statutory basis for it, and Sheriff Gore failed to meet his initial burden to demonstrate the absence of any triable issues of material fact on this negligent training theory. Accordingly, we reverse the judgment in favor of all defendants and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Birtcher's Death

In October 2017, the manager of a Hobby Lobby store in San Marcos, California, called law enforcement for mental health assistance because Birtcher was staggering near the front entrance, he had no shoes on, and he appeared to be disoriented and possibly under the influence of drugs. The manager stood with Birtcher outside and waited about 25 minutes for officers to arrive. During that time, Birtcher occasionally shuffled back and forth on the sidewalk, but did not appear to threaten or engage with anyone.

A psychiatric emergency response team comprised of Deputy Roland Garza and a mental health clinician, Briana Brasel, arrived at the scene and attempted to speak with Birtcher. Deputy Garza testified at his deposition that Birtcher had trouble focusing, was putting his hands in and out of his pockets, and "didn't seem like he was understanding what was going on." Deputy Garza decided to detain him "to assess further[.]" When the deputy tried to put Birtcher's hands behind his back, Birtcher pulled away, and Deputy Garza grabbed his shoulders and pushed him down onto the ground into a seated position.

Brasel called for emergency backup and Deputy John Robledo arrived at the scene to see Deputy Garza on top of Birtcher's back while Birtcher struggled to get up. When Deputy Robledo determined that Birtcher was

3

resisting Deputy Garza's efforts to detain him, he deployed his taser at Birtcher, which caused Birtcher to pause briefly before running into the parking lot. The deputies pursued Birtcher and deployed their tasers again, with little apparent effect. In the ensuing struggle in the parking lot, Deputy Robledo struck Birtcher several times in the head, hands, and torso with his fist and a "sap" weapon (made of leather and lead-weighted) while civilian bystanders also attempted to assist in restraining Birtcher. At some point Birtcher reached for Deputy Robledo's baton on the ground, but the deputy moved it away from his reach.

Deputies Drew Beatty, Adrien Carrillo, Joseph Kodadek, Scott Rossall, Frank Stalzer, and Scott Winter all responded to the scene, and several of them applied downward force on Birtcher to control his movements as he resisted restraint. Eventually the deputies handcuffed Birtcher's wrists behind his back and secured his ankles together with cords, wrapping one cord around his waist and connecting it from behind his back to both the handcuffs and the ankle cord for "maximum restraint."[1] At this point, Birtcher was lying prone on the pavement in the parking lot while several deputies pressed down with their hands and knees on Birtcher's back, legs, and arms. A deputy also placed a mesh "spit sock" over Birtcher's head after he spat once on the ground. After the spit sock was in place, the deputy pressed into the back of Birtcher's head and neck while he was still lying face down on the pavement.

The deputies eventually attached another set of handcuffs to Birtcher's rear belt loop and ankle cord, then secured another cord around his waist. At

---

[1] Plaintiff's expert referred to this as the "maximum restraint position." We express no view on whether or when in the sequence of events Birtcher was actually subject to "maximum" restraint.

4

some point Birtcher said, "Can't breathe," and called out for help. After several minutes of being prone with restraints and under bodyweight compression, Birtcher stopped moving, and 50 seconds later, the deputies placed Birtcher into a "recovery position" on his side for about six minutes. During that time, the deputies observed that Birtcher's breathing had slowed and become shallow. They administered two doses of Naloxone, a drug used to counteract the effects of an overdose.

It took a few minutes longer than usual for paramedics to arrive because of their station's distance from the scene. When they got there, a few deputies were still positioned over Birtcher, he had been rolled back to prone position, and he appeared to be unresponsive. Birtcher remained in prone position with officers applying downward pressure on him for about three minutes before the paramedics placed him on a gurney and wheeled him to the ambulance. Around that time the paramedics noticed Birtcher lacked a pulse and looked purple. They attempted life-saving measures on him, but were unsuccessful. The medical examiner who conducted Birtcher's autopsy opined that his cause of death was "sudden cardiac arrest while restrained" with "[a]cute methamphetamine intoxication" as a contributing factor. The manner of death was homicide.

### B. Federal Proceeding

Plaintiff and other family members filed suit in federal district court against defendants alleging civil rights violations under title 42 United States Code section 1983, as well as wrongful death claims under state law. The district court granted summary judgment to the defendants and denied the plaintiffs' cross-motion for summary judgment finding, among other things, that even assuming a reasonable jury could find that the deputies used excessive force, they were entitled to qualified immunity with respect to:

5

(1) Deputy Garza's first attempt to physically restrain Birtcher in front of the store entrance; (2) Deputies Garza and Robledo's taser deployments against Birtcher; (3) Deputy Robledo's fist and sap strikes; and (4) the deputies' prone restraint of Birtcher. The district court further found, in relevant part, that the County and Sheriff Gore were entitled to summary judgment because they could not be held liable under federal law where the deputies' conduct did not deprive Birtcher or plaintiff of a constitutional right. (See *Monell v. Dep't of Soc. Servs.* (1978) 436 U.S. 658, 690–691.) The court therefore dismissed plaintiff's federal claims against all defendants, declined to exercise supplemental jurisdiction over her remaining state law claims, and dismissed the state claims without prejudice.

Plaintiff appealed the decision to the Ninth Circuit, and as discussed below, she also refiled her state law claims in state court. While the state court proceeding was pending, the Ninth Circuit affirmed the district court's decision, but on slightly different grounds. The Ninth Circuit concluded, in relevant part, that the first three categories of force involving only Deputies Garza and Robledo did not constitute excessive use of force. (*A.B. v. County of San Diego* (9th Cir., Oct. 7, 2021, No. 20-56140) 2022 U.S. App. Lexis 9534 at pp. *2–*3.) As for the fourth and final category—that "deputy defendants used a forceful prone restraint on Birtcher after backup deputies arrived" (*id.* at p. *3)—the Ninth Circuit did not decide whether the deputies used excessive force, but instead affirmed the district court's ruling based on qualified immunity because it found there was "no clearly established law that would have put [the deputy defendants] on notice that the force they used was excessive." (*Id.* at pp. *3–*4.)

6

## C. State Proceeding

After appealing the district court's decision, plaintiff brought wrongful death claims in state court alleging battery, negligence and negligent training, and a survival action for violation of the Bane Act. In the state court proceedings, plaintiff represented that she was not basing her claims on the first three theories of excessive force decided against her in federal court, only the fourth theory based on the deputies' use of prone restraint.

The trial court denied defendants' first motion for summary judgment without prejudice to allow for additional briefing. Defendants' second motion argued that claim preclusion[2] barred plaintiff's claims, there were no triable issues of fact on excessive force, the County was immune from liability, and Sheriff Gore had no personal involvement with Birtcher or the deputy defendants. In support of their motion, defendants submitted: (1) deposition testimony and sworn statements from the deputies, Brasel, responding paramedics, and the Hobby Lobby manager; (2) a declaration from the Sheriff's Department emergency dispatcher; (3) videos from security and body-worn cameras; and (4) the autopsy report.

In opposition, plaintiff argued that a reasonable jury could find that the forceful prone restraint constituted battery or a violation of the Bane Act. Plaintiff also argued that defendants were all negligent in their tactics leading up to Birtcher's death, and that Sheriff Gore himself was negligent in failing to adequately train the deputies on the proper use of restraint methods. In addition to excerpts from the depositions and videos that defendants relied on in their motion, plaintiff also submitted a separate

---

[2] Although the parties and the trial court used the term res judicata, the correct modern term is claim preclusion. (*Samara v. Matar* (2018) 5 Cal.5th 322, 326 (*Samara*).)

statement of facts in response to defendants' statement, a statement of additional material facts, and the following additional evidence in support of her opposition: (1) deposition testimony from the County's designees on training and department procedures; (2) medical experts' deposition testimony about whether Birtcher was in a state of excited delirium during the incident; (3) deposition testimony from defendants' police practices expert; (4) documents and deposition testimony from the medical examiner and non-party witnesses; (5) audio recordings including interviews of the deputies; (6) training materials and logs produced by the County; (7) law enforcement policy publications; (8) Birtcher's medical and toxicology records; (9) additional video recordings from bystanders; (10) expert declarations and testimony regarding the use of force by law enforcement, Birtcher's cause of death, and his methamphetamine tolerance; (11) Sheriff Gore's department biography page; and (12) documents relating to the County's Citizens' Law Enforcement Review Board (CLERB).

Defendants filed a reply brief and responses to plaintiff's separate and additional statement of facts. In addition to reiterating arguments from their initial brief, defendants argued for the first time that California law "does not recognize a duty of care owed by sheriffs to the general public to train deputies with due care."[3] Defendants also asserted that because California's officer training is regulated by another state agency (POST), Sheriff Gore could not be found liable "for not setting a minimal standard for training on maximum restraints."

At the motion hearing, among other things, defense counsel argued that the maximum restraint used on Birtcher differed from a "hogtie" in that

---

[3]    Defendants do not pursue this argument on appeal, so we do not decide it.

the latter attaches a subject's ankles directly to his wrists and increases pressure on his torso and shoulders. The defense argued that maximum restraint, in contrast, merely pins a subject's handcuffed hands to his back or buttocks, and that the waist restraint is connected to the ankles with a length of cord that, when tightened, pulls the ankles more tightly to the buttocks. Defense counsel contended that "simply having the hands tightly against the buttocks and the ankles tightly against the buttocks doesn't impact the torso and does not impact breathing[,]" which distinguishes maximum restraint from a hogtie, which is dangerous.

Plaintiff's counsel argued that plaintiff's claims were still viable as to the use of force on Birtcher after he was under maximum restraint because he did not pose a threat at that point, and to the extent he may have been resisting arrest, deadly force was not justified. Plaintiff's counsel also contended that the issue was not necessarily whether the restraint was a "hogtie" or not, but rather whether the compression of Birtcher's chest in prone position constituted excessive force, causing his death. As for Sheriff Gore, counsel asserted that though defendants argued in their first motion that there was no legal basis for direct liability, they failed to raise it in their second motion except in their reply brief. Addressing the merits, counsel asserted that Government Code sections 820, subdivision (a), and 820.8 provide a legal basis for holding a public employee liable for injury caused by his own negligence. He further argued that the Sheriff's Department still has discretion over officer training because state agencies do not regulate all aspects of training, and case law supports finding that Sheriff Gore can be directly liable.

After considering the parties' briefs, supporting documents, and oral arguments at the motion hearing, the trial court issued a written order

9

granting summary judgment to defendants. The court began by overruling all of defendants' objections to plaintiff's evidence. The court then found that while the Ninth Circuit's ruling had preclusive effect as to the first three theories of liability based on force used before Birtcher was restrained, the holding did not have preclusive effect as to the fourth theory based on forceful prone restraint. Specifically, the trial court observed that the Ninth Circuit narrowly held that *if* the deputies used excessive force in the prone restraint, they still could not be liable under the federal qualified immunity doctrine. The trial court further noted that in contrast to federal law at the time of its ruling, California law looks beyond each discrete instance of force to the "totality of the circumstances" leading up to the alleged excessive force in determining whether the force was unreasonable. (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629–631 (*Hayes*).) Moreover, the trial court concluded that the district court's finding of no excessive force as to the fourth theory had no preclusive effect because the Ninth Circuit did not affirm the ruling on this ground, but instead relied on qualified immunity. In support, the trial court cited *Samara, supra*, 5 Cal.5th 322, which it correctly characterized as "holding that when an appellate court affirms an underlying judgment, but on *different grounds* than the ground identified by the trial court, only the grounds identified by the appellate court have res judicata impact."

The trial court went on to find, however, that there were no triable issues of material fact as to whether the deputies' use of prone restraint constituted excessive force. The court reasoned that Birtcher was not actually "hogtied," that the application of restraints was " 'by the book' " and "as it should be[,]" and that Birtcher "was rolled-over into the recovery position immediately after he stopped resisting." The court further found

10

that plaintiff had "not made a cogent or specific argument with sufficient evidence" as to why the restraint policy should be changed, or why it was insufficient to protect the safety of those being taken into custody. In deciding to grant defendants' motion on the prone restraint theory, the court observed that "the law and circumstances of this case rendered the instant motion a close call." The court nonetheless concluded that summary judgment is "no longer regarded as a disfavored procedural shortcut" and that defense counsel sufficiently addressed the court's concerns about the prone restraint at the motion hearing.

Lastly, the court acknowledged defendants' reply brief argument that officer training is controlled at the state level, and that Sheriff Gore "does not have the authority to control precisely what is and what is not taught." The court ultimately ruled that plaintiff lacked a legal basis for suing Sheriff Gore for negligence in training under California law.

After the court granted defendants' summary judgment motion, plaintiff moved for a new trial, which the court denied. The court then entered judgment in defendants' favor and dismissed the case with prejudice.

DISCUSSION

I

We begin by clarifying what theory of excessive force is before us. As noted, the trial court ruled that the federal judgment had preclusive effect as to the first three theories of liability based on allegedly excessive force used before Birtcher was restrained, but did not have preclusive effect as to the fourth theory based on the use of forcible prone restraint. The court reasoned that the Ninth Circuit affirmed the district court's ruling as to the first three theories on the ground that no excessive force occurred, but it affirmed as to the fourth theory based solely on the alternative ground of qualified

11

immunity, which the defendants in this state action did not assert as a ground for their summary judgment motion as to the state law claims.

On appeal, plaintiff does not contest the trial court's preclusion ruling as to the first three theories of excessive force based on the deputies' initial takedown, taser deployments, and impact strikes to Birtcher's head before he was prone or handcuffed. Plaintiff concedes that she may not argue these actions "in and of themselves, constituted independently actionable 'excessive force.' " Accordingly, the only theory of excessive force plaintiff argues on appeal is based on the deputies' use of forcible prone restraint with bodyweight compression.[4]

For their part, defendants do not address the trial court's claim preclusion analysis as to the fourth theory. Specifically, they do not discuss the trial court's reliance on *Samara* or its conclusion that the district court's judgment and the Ninth Circuit's qualified immunity ruling have no preclusive effect on plaintiff's remaining state law claims based on this fourth theory of excessive force. (See, e.g., *Venegas v. County of Los Angeles* (2007) 153 Cal.App.4th 1230, 1232 [federal doctrine of qualified immunity does not apply to California civil rights action under Civ. Code, § 52.1].) Although the defendants' summary judgment motion asserted claim preclusion (res judicata), their respondents' brief on appeal appears to rely on issue preclusion (collateral estoppel) under *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501 (*Hernandez*). Yet defendants do not discuss the required

---

4       As the trial court noted, however, even if the first three theories are not independently actionable, the deputies' conduct underlying those theories may still be relevant to the fourth theory because California law looks to the "totality of the circumstances" leading up to the allegedly excessive force in determining whether the force was unreasonable. (*Hayes, supra*, 57 Cal.4th at pp. 629–631.) We express no view on this question because it is unnecessary to our resolution of the appeal.

12

elements of either theory of preclusion and do not attempt to show how they would apply to the Ninth Circuit's qualified immunity ruling under the holding of *Samara*. Defendants have therefore failed to demonstrate any error in the trial court's preclusion ruling on this fourth theory. The primary issue before us, then, is whether there are triable issues of material fact on plaintiff's state law excessive force claims based on the deputies' use of forcible prone restraint with bodyweight compression.

## II

Plaintiff argues that there are triable issues of material fact on her theory that defendants used excessive force in applying forcible prone restraint to Birtcher with bodyweight compression. We agree.

### A. Governing Law

#### 1. Standard of Review

We review a grant of summary judgment de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) A defendant moving for summary judgment bears the initial burden to show that a cause of action has no merit by establishing that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 160 (*Calemine*).) Once the defendant meets this burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto, supported by evidence of specific facts and not mere allegations of the pleadings. (*Ibid.*)

On review, we examine the facts presented to the trial court and determine their effect as a matter of law. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) We review the entire record, considering all the evidence set forth in the moving and opposition

papers except that to which objections have been made and sustained. (*Ibid.*) Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. (*Ibid.*)

Summary judgment is appropriate only where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (*Regents, supra*, 4 Cal.5th at p. 618. ) " 'An issue of fact can only be created by a conflict of evidence. It is not created by "speculation, conjecture, imagination or guess work." ' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525 (*Brown*).) We focus on "issue finding" and do not resolve issues of fact. (*Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1292.) Rather, we review the evidence for contradictions, "or inferences reasonably deducible from the evidence, which raise a triable issue of material fact." (*Ibid.*) " '[T]he trial court's stated reasons for granting summary judgment "are not binding on us because we review its ruling, not its rationale." ' [Citation.] We affirm the summary judgment if correct on any of the grounds asserted in the moving party's motion." (*Carr v. City of Newport Beach* (2023) 94 Cal.App.5th 1199, 1204.)

2. Substantive Law Governing Plaintiff's Claims

Plaintiff alleges battery, negligence and negligent training, and Bane Act claims. "The elements of civil battery are: (1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff." (*Brown, supra*, 171 Cal.App.4th at pp. 526–527.)

For a negligence claim, the plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was

14

the proximate or legal cause of the resulting injury.  (*Hayes, supra*, 57 Cal.4th at p. 629.)

　　To prevail on her Bane Act claim, plaintiff would need to prove "(1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion."  (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 67.)  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 883.)

　　As noted, all of plaintiff's remaining claims are based on the deputies' use of allegedly excessive force in Birtcher's prone restraint.  Our Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force.  [Citations.]  The reasonableness of an officer's conduct is determined in light of the totality of circumstances."  (*Hayes, supra*, 57 Cal.4th at p. 629.)  Under the Fourth Amendment, claims that police officers used excessive force in the course of an arrest, investigatory stop or other seizure of a free citizen are analyzed under a reasonableness standard: "police officers may use force to the extent that it is objectively reasonable under the circumstances."  (*Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 887 (*Murchison*), citing *Graham v. Connor* (1989) 490 U.S. 386, 395, 397 (*Graham*).)  The "*Graham* factors" that federal courts use to determine whether force was excessive or unreasonable under the Fourth Amendment include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

15

whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham*, at p. 396.) Our Supreme Court has held that "[t]he same consideration of the totality of the circumstances," including the *Graham* factors, is required in determining reasonableness under California negligence law.[5] (*Hernandez, supra*, 46 Cal.4th at p. 514; see CACI Nos. 1305A & 3020 [incorporating the *Graham* factors into instructions on how to determine whether force is unreasonable].)

Analyzing whether an officer's actions are reasonable requires balancing the nature of the intrusion on the individual's Fourth Amendment interests against the government's interests. (*Murchison, supra*, 69 Cal.App.5th at p. 887, citing *Graham, supra*, 490 U.S. at p. 396.) The force applied must be balanced against the need for that force, and the need for force " 'is at the heart of the *Graham* factors.' " (*Murchison*, at p. 887, quoting *Liston v. County of Riverside* (1997) 120 F.3d 965, 976.) We judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather with the 20/20 vision of hindsight."

---

[5] In *Hayes*, our Supreme Court observed that California "negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used [citation]." (*Hayes, supra*, 57 Cal.4th at p. 639.) More recently, however, the United States Supreme Court brought Fourth Amendment law into closer alignment with California negligence law by explicitly rejecting the so-called "moment-of-threat rule" adopted by some federal circuits—which looked "only to the circumstances existing at the precise time an officer" used deadly force. (*Barnes v. Felix* (May 15, 2025, No. 23-1239) __ U.S. __ [2025 U.S. LEXIS 1834, *4; 2025 WL 1401083.]) The Supreme Court "reject[ed] that approach as improperly narrowing the requisite Fourth Amendment analysis." (*Ibid*.) "To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment." (*Ibid*.)

16

(*Graham*, at p. 396.) "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Ibid.*) "The 'inherently fact-specific determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases.' " (*Murchison*, at p. 887.)

### B. Analysis

Plaintiff contends there was conflicting evidence concerning whether the deputies' use of force was excessive, making summary judgment inappropriate. Specifically, she asserts she presented evidence that would allow a reasonable jury to find that the use of bodyweight compression and forcible prone restraint on Birtcher was excessive because he was handcuffed, hobbled, and did not pose an immediate threat of serious bodily harm. For the reasons we explain below, we agree there are triable issues of material fact on this theory of excessive force.

#### 1. Plaintiff's Expert Witnesses

Plaintiff submitted declarations and testimony from several experts in support of her opposition to defendants' summary judgment motion. One of them was Roger Clark, a police excessive force expert, who reviewed court filings, investigation reports, video and audio recordings, deposition transcripts, Sheriff's Department policies and procedures, and other documents in forming his opinions.

Based on his review of the evidence, Clark concluded that the use of force inflicted on Birtcher was excessive and unreasonable, including the force used by deputies in pressing down and applying weight on his back and head while he was in a forcible prone restraint position with handcuffs

17

connected to his ankles. A reasonably trained deputy would have known that the sustained application of pressure or weight on the torso of a subject who is prone on the ground may make it more difficult for the subject to breathe. In Clark's opinion, it was unreasonable for the deputies to continue to apply pressure and bodyweight on Birtcher after he was handcuffed and hobbled. A properly trained deputy would have understood that the application of pressure and bodyweight on Birtcher's legs, back, neck, and head could significantly contribute to a positional asphyxia condition, particularly with the spit sock over his head and after he exclaimed that he could not breathe.

According to Clark, there is a widely used form of law enforcement training referred to as the "physiology of a struggle." A properly trained officer would know that when a person is lying face down, breathing can be more difficult because the weight of the person's body must be lifted to breathe properly, and an officer kneeling or lying on the individual's back aggravates the situation. The greater the weight or more intense the compression on the person's back, the harder it becomes for the person to breathe. As a result, the suspect struggles more violently, and an untrained officer may respond by using more force. With no reserve oxygen left and unable to take deep breaths, the individual slips into unconsciousness and could be dead in minutes. Clark concluded that the deputies in this case failed to follow policy and acted unreasonably when they placed bodyweight on Birtcher while he was handcuffed.

In Clark's opinion, based on the video footage, Birtcher did not appear to be resisting after he was under maximum restraint. Birtcher was instead yelling out "help" and "get it off me" while attempting to alleviate the pressure on his chest by lifting his head. According to Clark's review of the evidence, Birtcher was never assaultive or life-threatening. Clark noted that

18

Birtcher had merely been acting strangely and possibly under the influence when law enforcement was called; he had not committed any assault or attempted assault; he was alone and unarmed; he appeared to be disoriented; and he did not attack Deputy Garza but merely tried to avoid contact with him and flee.

The trial court did not mention Clark's opinions in its ruling and did not explain why they were insufficient to create a triable issue of material fact on excessive force. Likewise, defendants on appeal fail to make any meaningful argument why Clark's expert opinions based on his review of the evidence do not create a triable issue of material fact. In their brief, the defendants refer to a prior case decided by this court (*Brown, supra*, 171 Cal.App.4th 516) and two unpublished federal district court decisions that rejected Clark's opinions in vastly different factual circumstances. But we cannot disregard expert testimony on summary judgment merely because courts in other unrelated cases may have criticized or rejected the expert's opinions on different facts and issues. The defendants do not challenge Clark's qualifications as a use-of-force expert, and Clark's report lists scores of cases in which his opinions have been accepted on such issues. We must evaluate Clark's opinions based on the facts and circumstances of this case, not other cases.

The defendants' only substantive comment on Clark's expert testimony in this case is to claim in a single conclusory sentence that he failed to provide "a reasoned explanation of how and why maximum restraints are deadly force." As we have described, however, Clark did explain how and why the forcible prone restraint and bodyweight compression constituted deadly force—and in fact did result in Birtcher's death. Defendants' mere assertion to the contrary without any meaningful analysis is not a basis to

19

disregard Clark's opinions.[6]  "The rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact.  [Citations.]  In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial."  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189.)

Liberally construing Clark's testimony and report, we conclude that his opinions are sufficiently supported by video and other evidence to raise a triable issue of fact.  For example, his conclusion that there was no evidence Birtcher threatened anyone that day, either before or during the incident,

---

[6]  "[E]xpert testimony on the use of force has often been admitted in California excessive force cases without objection."  (*People v. Sibrian* (2016) 3 Cal.App.5th 127, 136; see also *Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 764 ["expert testimony can be admissible on the issue of reasonable force"].)  On appeal, defendants have not challenged the trial court's decision to overrule all their evidentiary objections, including any objections they made to Clark's report and testimony.  The court found that defendants' objections failed to comply with the formatting requirements in California Rules of Court, rule 3.1354, and failed to discretely identify objectionable material.  On appeal, defendants still do not specify which portions of Clark's report and testimony they objected to, and they do not state the grounds for those objections, discuss the relevant law concerning their objections, or explain how the trial court erred in overruling them. Defendants have forfeited any challenge to the trial court's evidentiary rulings by failing to renew them on appeal.  In a summary judgment appeal, "[t]he party making the evidentiary objection at the trial level forfeits it by not renewing it on appeal."  (*Gray v. La Salle Bank, N.A.* (2023) 95 Cal.App.5th 932, 969, fn. 22; see also *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 ["the burden [is] on the objector to renew the objections in the appellate court"].)

was supported by cites to deposition testimony from Deputies Robledo and Garza. Clark observed from his review of the evidence, and defendants do not dispute, that Birtcher was never found to have a weapon and was not harming himself or anyone else when first encountered.

Likewise, Clark's opinions and the supporting evidence create a triable issue of fact on defendants' assertion that the use of force was justified because Birtcher was resisting arrest. In response, plaintiff contends that after Birtcher was placed in maximum restraint position, he was only "squirming," yelling, "wiggling[,] and trying to lift his torso" because he was having trouble breathing. Clark observed in his report that Birtcher did not appear to be resisting after he was restrained in prone position, and that he was only "attempt[ing] to alleviate the pressure on his chest by lifting his head slightly" and yelling for help. Clark further observed that Birtcher was making grunting noises and appeared to be struggling to breathe. Our own review of the video evidence, construed in plaintiff's favor, persuades us that Clark's interpretation is at least reasonable and could rationally be accepted by the jury. In fact, Deputy Beatty testified to being trained that a person who is restrained prone with bodyweight on their back might attempt to move their body in an effort to breathe more adequately. Sergeant Alan Noble said Birtcher was "squirming his body," and Deputy Stalzer described Birtcher's "resistance" as "wiggling" his body and "trying to raise his chest and his body off the ground[,]" which is consistent with Clark's observations. Clark's opinions therefore find support in plaintiff's other evidence, and also reinforce plaintiff's argument that the deputies used excessive force once Birtcher ceased "actively resisting arrest or attempting to evade arrest by flight." (*Graham, supra*, 490 U.S. at p. 396.) On this record, a reasonable

trier of fact could reject the trial court's conclusion that Birtcher "was rolled-over into the recovery position immediately after he stopped resisting."

Federal jurisprudence also supports Clark's opinion that Birtcher's movements did not necessarily constitute "resistance." (See, e.g., *K.J.P. v. Cnty of San Diego* (S.D.Cal. 2022) 621 F.Supp.3d 1097, 1117 [jury could find hogtied man's movements were "attempt to breathe," not resistance]); *Garlick v. Cnty of Kern* (E.D.Cal. 2016) 167 F.Supp.3d 1117, 1159 [larger man who kicked deputies, tried to lift his chest, and yelled did not warrant asphyxiating restraint because those were all signs he could not breathe].) And more importantly, as plaintiff points out, "[r]esistance, or the reasonable perception of resistance, does not entitle police officers to use *any* amount of force to restrain a suspect." (*Barnard v. Theobald* (9th Cir. 2013) 721 F.3d 1069, 1076, italics added.) Moreover, if the use of force causes serious injury or death, a reasonable jury could certainly still conclude that the force was excessive, even if the person had been resisting at the time. (See *LaLonde v. County of Riverside* (9th Cir. 2000) 204 F.3d 947, 959.) Resistance is merely one of the factors the jury can consider in determining whether force is excessive. (See *Graham, supra*, 490 U.S. at p. 396.)

As we discuss further below, Clark's opinion that the deputies did not act in accordance with protocols regarding physical restraints and mental health crises is also supported by policy and training documents. His review of the County Sheriff's Office's maximum restraint policy showed that it did not include instruction about "the physiology of a struggle" and minimizing "the length of a struggle" with someone at risk of asphyxiating. If credited by the jury, Clark's opinions would therefore refute the notion that the application of restraints to Birtcher was "by the book" and "as it should be."

Finally, plaintiff's other expert evidence further supports Clark's reasoned explanation "of how and why maximum restraints are deadly force." Plaintiff submitted the report and deposition testimony of Dr. Ronald O'Halloran, a forensic pathologist and retired medical examiner. Dr. O'Halloran provided opinions based on his review of, among other things, the medical examiner's records and deposition, Birtcher's medical records, video evidence, and the deputies' depositions. He concluded that: (1) Birtcher "died from asphyxia by chest compression and by oral and nasal obstruction during prone restraint by police officers[,]" including their use of the spit sock; (2) "[i]n the much less likely event that [Birtcher] didn't die from asphyxia during restraint, but rather died from an acute cardiac arrhythmia during restraint, the restraint activities by police would still be direct, significant, causal factors in the death[]"; and (3) the medical examiner was correct to determine Birtcher's cause of death was "sudden cardiac arrest while restrained," with the manner of death being "homicide."

Plaintiff also presented a report and deposition testimony from Dr. Bennet Omalu, a forensic pathologist and neuropathologist. Dr. Omalu reviewed the medical examiner's records, Birtcher's medical records, video evidence, incident reports, deposition transcripts, and audio recordings of interviews. In addition to providing a medical explanation of Birtcher's death, Dr. Omalu concluded that Birtcher died from restraint asphyxiation, with concussive traumatic brain injury and acute methamphetamine toxicity as contributing factors to his death. More specifically, Dr. Omalu opined that Birtcher's fatal injuries were directly caused by "repeated blows to his head from punches, hammer-fist and slapjack baton strikes," repeated taser deployments, and "multi-modal restraint asphyxiation," which included both

23

"mechanical-positional asphyxiation" as well as "mechanical-smothering asphyxiation" from the spit sock and having his face pressed into the ground.

Viewing plaintiff's expert reports together and resolving doubts about the evidence in plaintiff's favor, we conclude that the expert opinions and the evidence on which they are based could lead a reasonable jury to find that the deputies used excessive force by holding Birtcher down forcefully in a prone position for an extended period after he was placed in restraints, resulting in his death.

### 2. Evidence of Training and Policy Violations

Because the reasonableness of a particular use of force is judged from the perspective of a "reasonable officer" on the scene, department policies, prevailing standards, and training protocols addressing how a reasonable officer should act in similar circumstances are often relevant to determining whether force was excessive. (See *Murchison, supra*, 69 Cal.App.5th at p. 887; *United States v. Brown* (11th Cir. 2019) 934 F.3d 1278, 1296 [while violation of department use-of-force policies does not, by itself, establish excessive force, it can be one of a number of factors to consider on the issue of whether the force used was excessive]; cf. *Samples v. Atlanta* (11th Cir. 1990) 916 F.2d 1548, 1551 [expert testimony on "the prevailing standards in the field of law enforcement" on the use of force was admissible in an excessive force case].) As noted, the trial court's finding that there were no triable issues on excessive force was largely based on its conclusion that the deputies' actions were "by the book." But defendants made no reference to any policies or training in their own statement of undisputed material facts, and the court did not explain how it concluded that the deputies' use of

24

forceful prone restraint with downward pressure conformed to any policy or training materials in the record.

Plaintiff, however, did present evidence from which a reasonable jury could conclude that the deputies' use of force was not by the book. Her evidence, including the deputies' own testimony, showed that at least some of the deputies were trained to know that a person in prone position with bodyweight applied to their torso could have difficulty breathing. Not only were the deputies trained to use the "minimum force" possible to effect arrest or prevent escape, they were also trained to minimize the amount of time a subject is in prone position because they might experience a medical emergency "not merely during the application of weight." According to plaintiff's evidence, deputies are trained to roll a prone person onto their side or to a seated position as soon they are maximally restrained to allow for monitoring a subject's vital signs and to make it easier for them to breathe.

In our own review of the County's training video on maximum restraints, we observed that as soon as the restraints were applied to a training subject on a sidewalk, the officers lifted him off the ground and transported him to a nearby police vehicle, where he was raised to a seated position in the backseat. Later in the video when maximum restraints were applied to a training subject in custody, officers again lifted him off the ground immediately and placed him in recovery position on a gurney. The video warned that during transport, subjects must be placed on their side, continually monitored, and "must not be transported in prone position." We also observed that in each training scenario, the cord connecting the training subject's handcuffed wrists to his bound ankles was always passed in front of the subject's body, allowing enough slack for the subject to be in a seated

25

position. A County designee confirmed that deputies are taught to run the cord cuff in front of the subject's waist.

Despite this training, a jury could reasonably conclude that the deputies in this case did not use the minimum force possible, nor did they minimize the amount of time Birtcher spent in prone position. They did not roll him onto his side right away once the restraints were attached, nor did they lift him off the ground or raise him to a seated position. Defendants have provided no evidence to explain why it was reasonable as a matter of law to keep Birtcher in a prone position and continue applying pressure to his back after he was immobilized by the handcuffs and leg restraints. When the bodycam footage showed Birtcher going limp, it took another 50 seconds for the deputies to put Birtcher into recovery position, then later they returned him to a prone position while pressing down on him for another significant period of time. The deputies also did not apply the restraints to Birtcher in a way that was consistent with the training video because his waist cord was connected to his ankles from behind his waist.

Not only was there evidence that the deputies failed to comply with their own training, plaintiff also submitted evidence from which a reasonable jury could find that the deputies' actions were inconsistent with prevailing police standards. A County designee testified that when renewing and updating training curriculum, the County might incorporate "something that the [International Association of Chiefs of Police (IACP)] has adopted or another entity has adopted." A model policy on arrest published by the IACP states that officers should only use additional approved restraints beyond handcuffs when "necessary to control the situation and only for the period of time required." The IACP model policy also specifies that "[w]hen restraining individuals on the ground, officers should position the subject in a manner

26

that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck, or head." Rather than avoiding pressure to the chest, neck, and head as the IACP policy suggests, here the deputies applied bodyweight pressure to multiple parts of Birtcher's body, even after there was no possibility that Birtcher could assault them or flee.

A policy review article entitled "The Prone Restraint—Still a Bad Idea," published by the IACP in 1998, stated that a combination of factors can make the prone restraint position deadly. Those factors could include "both the physical build of the prisoner, the degree of exertion occurring during efforts to gain control of the subject and apply restraints, and the presence of drugs and/or alcohol in the prisoner's system." The article noted that "[i]n many cases, application of restraints to a violently resisting subject requires that officers apply their weight on the back of the subject in order to gain control of the hands so that handcuffs can be applied. This action typically compresses the subject's chest cavity and further adds to oxygen depletion and difficulty in breathing." The IACP article concluded that "there is considerable evidence, both in terms of expert opinion and actual field experience, that indicates that the practice of prone restraint does in fact lead to deaths among suspects in the custody of the police. Therefore, until such time as this threat is proven non-existent, a prohibition against unqualified use of this restraint procedure for prisoners should be included in all law enforcement agency policy."

Despite these policy statements, the scenario described in the IACP article came to fruition here. The "degree of exertion" during efforts to gain control of Birtcher was great, and consistent with the deputies' observations of him, the toxicology report showed that Birtcher had methamphetamine in his system. As Drs. O'Halloran and Omalu opined, Birtcher's chest was

27

compressed during the struggle to subdue him, which further added to his difficulty in breathing and ultimately led to his death.

Defendants offered no evidence to contradict or dispute plaintiff's policy and training evidence at summary judgment. Aside from characterizing the evidence as immaterial and irrelevant, defendants made no argument that the documents published by the IACP—of which Sheriff Gore is a member— were not representative of prevailing policing standards, nor did they explain how the guidance in those documents are consistent or inconsistent with County policy or training protocols. Accordingly, viewing the policy evidence in the light most favorable to plaintiff, we conclude that she has shown that a triable issue of fact exists regarding whether the deputies acted unreasonably by violating training protocols.

### 3. Defendants' Admissions and Expert Testimony

We have already identified several instances in which defendants' own admissions and testimony has supported plaintiff's argument that there are triable issues of fact regarding excessive force. To those instances, we add the following:

- Deputy Beatty testified that Birtcher never appeared to pose an imminent threat of death or serious bodily injury to anyone. He said that once ankle restraints were applied, Birtcher could not move his legs independently. Deputy Beatty also testified that he was kicked before ankle restraints were applied, but he denied feeling any pain immediately after the kick.

- Brasel testified that she did not see Birtcher trying to punch, kick, or grab anyone during the altercation, and that Birtcher was not agitated until Deputy Garza made physical contact with him.

- Deputy Carrillo testified that he had no information while he was at the scene indicating Birtcher was armed, or that he punched, kicked, or threatened anyone.

28

- Deputy Winter testified that to his knowledge, Birtcher had not verbally threatened anyone, tried to take anyone's weapon, or possessed any weapons during the incident. He also testified that at no time either before he arrived on the scene, or while he was there, did he think that Birtcher posed an immediate threat of death or serious bodily injury.

- Jeffrey Martin, defendants' police practices expert, testified that after reviewing the video and other evidence, his opinion was that it would not have been appropriate to use deadly force against Birtcher after he was handcuffed. Martin explained that "at the time, there wasn't anything that would lead a trained and reasonable officer to believe that him- or herself or any other persons were in imminent threat of death or serious bodily injury." He also confirmed that the deputies had no information that Birtcher had a weapon, that he had threatened to harm anyone, or that he had committed any violent crime.

Martin further testified that in his review of the video evidence, although he saw that there "was clearly movement[,]" he never saw a weapon in his hand, nor did he see Birtcher "land a punch" or "land a kick" on any deputies. His review of the County's maximum restraint training materials also led him to conclude that the County's policy is that "as soon as possible after a subject is maximally restrained, they'll be rolled onto their side or put into a seated position." He explained that he understood the purpose of the policy, as "with most agencies," was to "avoid the accusation of a death or injury due to the positional asphyxia theory."

These admissions by defendants, defense witnesses, and defendants' own expert bolster our conclusion that triable issues of fact exist because they create concrete contradictions in the evidence surrounding "the severity of the crime [or conduct] at issue," whether Birtcher posed "an immediate threat to the safety of the officers or others," and whether he was "actively resisting arrest or attempting to evade arrest by flight." (*Graham, supra*, 490 U.S. at

29

p. 396; see *Brown, supra*, 171 Cal.App.4th at p. 525.) Specifically, the admissions would further support jury findings that Birtcher had committed no crime other than drug use, he was not a violent criminal, he posed minimal or no threat to the safety of others when he was restrained, and for reasons described above, he was not resisting arrest after he was handcuffed and hobbled. Based on the totality of the circumstances, a jury could conclude that the force used to restrain Birtcher was excessive and unreasonable, particularly for a situation in which law enforcement was responding to someone who was merely under the influence of drugs and suffering from a mental health crisis and had not committed or threatened any act of violence. This evidence, therefore, supports our conclusion that the trial court erred in granting summary judgment.

### 4. Case Law Supporting Plaintiff's Theory

Both federal and state courts have applied *Graham*'s "objective reasonableness" standard to find that similar prone restraint incidents constituted excessive force. In *Scott v. Smith* (9th Cir. 2024) 109 F.4th 1215 (*Scott*), the Ninth Circuit found that when an officer kept his bodyweight on Scott's back and neck for one to two minutes while another officer restrained Scott's lower body, both officers had used "deadly force." (*Id.* at p. 1224.) The Ninth Circuit further held that a reasonable jury could find that the force was excessive because Scott was "a mentally ill person who was not suspected of committing a crime and presented little or no danger." (*Id.* at p. 1225.) In its qualified immunity analysis, the court observed that "[o]ur caselaw makes clear that any reasonable officer should have known that bodyweight force on the back of a prone, unarmed person who is not suspected of a crime is constitutionally excessive. . . . The law is especially clear where, as here, the officers know the prone individual is suffering from a mental illness and is

30

not suspected of a crime." (*Id.* at p. 1226, quoting *Drummond v. City of Anaheim* (9th Cir. 2003) 343 F.3d 1052, 1059 (*Drummond*).)

In *Drummond*, officers responded to a call and found Drummond in a parking lot "hallucinating and in an agitated state." (*Drummond, supra*, 343 F.3d at p. 1054.) They decided to detain him "for his own safety," knocked Drummond to the ground, and handcuffed him. (*Ibid.*) One officer "put his knees into" Drummond's back and placed his bodyweight on him while a second officer did the same, except that he had one knee on Drummond's neck. (*Ibid.*) The officers continued to kneel on Drummond's back and neck despite his pleas that "he could not breathe and that they were choking him." (*Id.* at pp. 1054–1055.) Drummond was later placed in a "hobble restraint," and one minute later he fell unconscious. (*Id.* at p. 1055.) Although he was revived after several minutes, he remained in a "permanent vegetative state." (*Ibid.*)

In holding that the force was excessive, the Ninth Circuit emphasized that the level of force used was "severe," because "two officers continued to press their weight on [Drummond's] neck and torso as he lay handcuffed on the ground and begged for air." (*Drummond, supra*, 343 F.3d at p. 1056.) The Ninth Circuit also found that although Drummond may have presented a danger to himself or others *before* being handcuffed, once he was prone on the ground with his arms cuffed behind his back, "a jury could reasonably find that he posed only a minimal threat to anyone's safety." (*Id.* at pp. 1057–1058.) Lastly, the court noted that Drummond's obvious mental illness suggested that officers should have considered using less severe measures. (*Ibid.*) Considering these factors, the Ninth Circuit held that any reasonable officer "should have known that squeezing the breath from a compliant,

31

prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." (*Id.* at p. 1059.)

In *Estate of Aguirre v. City of San Antonio* (5th Cir. 2021) 995 F.3d 395 (*Aguirre*), officers applied "prone maximal-restraint" to Aguirre, who appeared mentally disturbed and potentially under the influence of drugs. (*Id.* at pp. 402–404.) The officers placed Aguirre in prone position with his legs pushed up by his buttocks and kneeled forward on his legs, holding them near his bound hands "in a hog-tie-like position." (*Id.* at p. 403.) One officer "knelt with one knee on the ground and the other on Aguirre's back, later changing position to hold Aguirre's shoulders and cheek down against the pavement with his hands." (*Ibid.*) Other officers placed their hands on Aguirre's arms and back to hold him prone in the maximal-restraint position. (*Id.* at pp. 403–404.) After being held in that position for approximately five-and-a-half minutes, Aguirre stopped breathing. (*Id.* at p. 404.) A subsequent autopsy report concluded that Aguirre died by homicide, and that the prone restraint caused him to asphyxiate. (*Ibid.*)

The Fifth Circuit held that the use of forceful prone restraint on Aguirre was excessive because there was no "criminal investigatory function justifying their actions[]" and he posed only a minimal threat to public safety. (*Aguirre, supra,* 995 F.3d at pp. 407–408.) The court further concluded that the summary judgment evidence, including videos, "at minimum raise[d] genuine questions about whether it was objectively reasonable to believe Aguirre was actively resisting or even physically capable of posing an immediate safety threat that would justify the Defendant Officers in using extraordinarily dangerous force by placing and holding him in the prone maximal-restraint position that led to his death." (*Id.* at p. 408.)

In *Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702 (*Mendoza*), a homeowner called the police after Mendoza tried to open a window. (*Id.* at p. 706.) Mendoza, who had recently been to the hospital for alcohol withdrawal sickness, complained of stomach pain and hearing voices. (*Ibid.*) The jury heard varying accounts of what happened after the defendant officer took him to the hospital, but according to the officer, Mendoza became agitated and resisted being subdued. (*Id.* at pp. 706–707.) The officer punched and tasered Mendoza several times while Mendoza yelled for him to stop. (*Id.* at p. 709.) Three other officers arrived later and helped the defendant officer hold Mendoza down in prone position, handcuff him, and then pull him up to a sitting position. (*Id.* at p. 707.) Mendoza was dead soon after. (*Ibid.*)

The Court of Appeal in *Mendoza* upheld the jury's verdict that the defendant officer used excessive force when he and the other officers applied their bodyweight on Mendoza's back while he was pinned and handcuffed. (*Mendoza, supra*, 206 Cal.App.4th at p. 719.) The court found substantial evidence to support the jury's finding that the officer punched and tasered a non-resisting, "emotionally troubled and physically ill" man, and that the officer was "responsible for the restraint that caused Mendoza to asphyxiate[.]" (*Id.* at p. 720.)

The similarities between the facts in each of the above cases and the circumstances in this case are striking. The individuals in those cases, like Birtcher, were suffering from a mental health crisis. In each instance, an officer or multiple officers applied forceful bodyweight pressure to the subject's back while he was in prone position with his hands secured behind him. None of the individuals appeared to be armed when they died or were incapacitated by asphyxiation. In at least some cases, whether they were

33

even "resisting" was a disputed issue. And in the majority of the cases discussed above, the subjects, like Birtcher, were never suspected of criminal activity.

These are just some of the numerous cases plaintiff cites to prove the point that courts have often found a triable issue of material fact in remarkably similar circumstances. Yet defendants provide no substantive rebuttal to any of the cases. They merely assert that this case is different from *Drummond* and *Scott* because the Ninth Circuit in this case "upheld summary judgment for [defendants] based on Fourth Amendment considerations." But the trial court correctly observed that the Ninth Circuit here did not actually rule on whether the prone restraint constituted excessive force. Nor do defendants meaningfully dispute that applying pressure to Birtcher's torso while he was restrained and in a prone position constituted deadly force, an issue the Ninth Circuit also did not address in its memorandum opinion.

Over 20 years ago, the Sixth Circuit found it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." (*Champion v. Outlook Nashville, Inc.* (6th Cir. 2004) 380 F.3d 893, 903.) "Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." (*Ibid.*; see also *Lombardo v. City of St. Louis* (2021) 594 U.S. 464, 467 (per curiam) [referring to "well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of [the risk of suffocation]" and finding factual issues precluded summary judgment as to whether use of force was excessive].)

34

In sum, based on the totality of the plaintiff's evidence, ample case law supports the conclusion that a reasonable jury could find putting Birtcher in restraints in a prone position, and holding him in that position forcefully using bodyweight for an extended period, constituted excessive force. We must therefore reverse the trial court's grant of summary judgment.

## III

Plaintiff argues the trial court erred in finding that there was no legal basis for holding Sheriff Gore directly liable for negligent training. We agree. The trial court erred in granting summary judgment to Sheriff Gore because he failed to meet his initial burden, as the moving party, of demonstrating the absence of any triable issues of material fact as to plaintiff's negligent training claim.

The trial court ruled that plaintiff had "not identified a *legal* basis for sustaining a claim of negligent training against Sheriff Gore under *California* law." At the hearing on defendants' summary judgment motion, however, plaintiff's counsel asserted that Government Code section 820, subdivision (a), provided a statutory basis for holding Sheriff Gore directly liable for his own negligence. That section provides that except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons. (*Hayes, supra*, 57 Cal.4th at pp. 628–629; Gov. Code, § 820.) Neither defendants nor the trial court addressed that statute. Instead, defendants now assert that Government Code section 820.8 gives Sheriff Gore immunity. But by its own terms, that section only immunizes public employees for injury "caused by the act or omission of *another* person" and does not "exonerate[] a public employee from liability for injury proximately caused by his *own* negligent or

35

wrongful act or omission." (Gov. Code, § 820.8, italics added.) Accordingly, Government Code section 820 provides a legal basis for a direct negligence claim against Sheriff Gore for his own wrongful acts or omissions.[7]

Defendants nevertheless assert that Sheriff Gore cannot be liable because he was not personally involved in training the deputies. This was the sole basis for their summary judgment motion as to the negligent training claim against Sheriff Gore. But defendants submitted no declarations or any evidence whatsoever to show that Sheriff Gore did not play a role in the department's training policies or the deputies' training, or that he had no knowledge or notice of deficiencies in the training policies. In fact, there is not a single reference to Sheriff Gore, or plaintiff's negligent training claim against him, in the defendants' statement of undisputed facts. Sheriff Gore himself submitted no declaration. It was Sheriff Gore's initial burden on summary judgment to submit evidence demonstrating his lack of involvement in the training policies and to include that evidence in the statement of undisputed facts. (*Calemine, supra*, 171 Cal.App.4th at p. 160.) He failed to do so. As a result, he did not meet his initial burden of negating all theories of liability alleged in the complaint. (See *Hufft v. Horowitz* (1992) 4 Cal.App.4th 8, 23 ["Summary judgment is improper unless the moving party negates every alternative theory of liability presented by the pleadings."].)

By contrast, plaintiff presented testimony from a County designee unequivocally confirming that "[a]ny policy and procedure has to be approved ultimately by the Sheriff[.]" The designee explained in his deposition that a committee annually reviews every policy, "starting at Page 1 and going

---

[7]     We do not decide whether any other form of statutory immunity might apply because defendants have not argued any other theory of immunity.

through everything[,]" and then that review is presented to the Sheriff. Even though defendants have argued that POST regulates officer training, the designee testified in his deposition that the department *itself* created the training outline for "arrest and control training," and after POST approved it for use, "that's what [got] taught" to officers.

Not only did Sheriff Gore fail to meet his initial burden as the moving party, therefore, but when we draw all reasonably deducible inferences from plaintiff's evidence, there is also a triable issue of material fact as to whether Sheriff Gore was personally involved in approving the training of the deputies. Because defendants make no other argument on the negligent training theory against Sheriff Gore, we must reverse the judgment as to him as well. (Cf. *McBeth v. City of Union* (D.S.C. Sept. 25, 2018, No. 7:15-1473-BHH) 2018 U.S. Dist. Lexis 164121, at *51 [finding genuine dispute of material fact on claim against sheriff for "failure to properly train his deputies regarding the dangers of positional asphyxia" and finding that "[a] reasonable policy maker, given the available literature that positional asphyxia is one of the chief causes of sudden in-custody deaths, should develop a policy and training on the topic" including "education on the physiology of struggle" and "that an arrestee's attempts to get up and/or get officers off them while they are in a prone position may be an effort to facilitate breathing rather than resistance"]; *Briones v. City of Ont.* (C.D. Cal. May 21, 2018, No. ED CV 17-590-DMG (JPRx)) 2018 U.S. Dist. Lexis 227680, at *8, 31–32 [denying summary judgment on claim of municipal liability for failure to properly train officers on dangers of positional and restraint asphyxia, including the "physiology of a struggle" and dangers of applying pressure to detainee's back while in prone position].)

## DISPOSITION

The judgment is reversed and the matter is remanded with directions that the trial court vacate its order granting defendants' second motion for summary judgment and issue a new order denying the motion.  Appellant may recover her costs on appeal.


BUCHANAN, J.

I CONCUR:


IRION, Acting P. J.


I CONCUR IN THE RESULT:


CASTILLO, J.

38